FILED
97 JAN 31 PM 4:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM LAMBETH, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | CASE NO. CV 96-B-0644-S |
| } | |
| QUALITY MACHINE & FAB } | |
| WORKS, INC., } | |
| } | |
| Defendant. } | |

ENTERED
FEB 03 1997

MEMORANDUM OPINION

This matter is before the court on the motion of Plaintiff William Lambeth ("Lambeth" or "plaintiff") for partial summary judgment, and the motion of defendant Quality Machine & Fab Works, Incorporated ("Quality" or "defendant") for summary judgment. Upon consideration of the record, the submissions of the parties, the argument of counsel, and the relevant law, the court is of the opinion that plaintiff's motion is due to be denied, and defendant's motion is due to be granted.

This case involves plaintiff's allegations that defendant engaged in disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 (1994), ("ADA"), by terminating him from his position at Quality on July 6, 1995. Because the issues in plaintiff's motion for partial summary judgment are the same as the issues in defendant's motion for summary judgment, namely, whether plaintiff suffers from a disability as that term is defined by the ADA, the court will address each of these motions together.

## I. FACTUAL SUMMARY

On or around November 22, 1982, Lambeth was injured while working for American Machine Corporation. (Lambeth Dep. at 35.) As a result of this incident, Lambeth suffered a fracture and dislocation of his left ankle, a fractured fibula, scalp laceration, cervical strain, and a low-back strain. (Rogers Dep. at 9.)

Lambeth's treating physician, Dr. Gaylon Rogers, examined Lambeth on several occasions during 1982 and 1983. (*Id.* at 14.) Thereafter, Dr. Rogers saw Lambeth once a year in 1984, 1985, 1986, and twice during 1987. (*Id.*) Dr. Rogers did not see Lambeth again for approximately four years, but he did examine him twice in 1991, once in 1992, and twice in 1993, 1994, and 1995. (*Id.*)

Lambeth began working as a machinist for defendant Quality on October 1, 1991. (Lambeth Dep. at 26 & 74.) From June 23, 1995, until July 3, 1995, Lambeth was out of work due to neck pain. (Lambeth Dep. at 81-83.) When he returned to work on July 3, 1995, he presented a note from Dr. Gaylon Rogers to his supervisor, Billy McKay. (*Id.* at 83.) According to the doctor's note, dated June 26, 1995, and signed by Dr. Rogers, Lambeth was able to "return to regular work" at that time. (Attached as Def.'s Ex. 3 to Lambeth Dep.)

After the July 4, 1995 holiday, Lambeth returned to work on July 5 and 6, 1995. (Lambeth Dep. at 41-42 & at 84.) On July 6, 1995, Lambeth presented Billy McKay with a letter from Dr. Gaylon Rogers. (McKay Dep. at 18.) In the letter, Dr. Rogers indicated that because of Lambeth's ankle problem, he recommended that Lambeth be restricted to a forty hour work week with no more than five days continuous work, and that he not be required to

2

stand for more than two hours at a time without having a break of approximately fifteen minutes to unload his ankle. (Attached as Pl.'s Ex. 3 to Rogers Dep.) When Lambeth presented Mr. McKay with the letter, he informed him that he would be willing to work up to forty-eight or fifty hours, so long as he could have two days off in a row. (Lambeth Dep. at 50).

Later that day, Mr. McKay informed James Bailey, defendant's General Manager, about the letter he had received from Lambeth, his conversation with Lambeth, and Lambeth's desire to work more hours than Dr. Rogers recommended, in order to have two days off in a row. (McKay Dep. at 23-25.) In Mr. Bailey's opinion, Lambeth was using the letter as a way to blackmail the company into allowing him to work up to sixty hours per week, without having to work weekends. (Bailey Dep. at 31.) On or around July 6, 1995, Quality terminated Lambeth's employment. (Lambeth Dep. at 41.)

In September of 1995, Lambeth took a position as a plant supervisor at Service Machine Company ("SMC") in Dothan, Alabama. (Lambeth Depo. at 18-19.) During his tenure at SMC, Lambeth typically worked from ten to thirteen hours per day, five and six days per week. (Flatt Depo. at 20-21.)

On March 11, 1996, Lambeth, filed suit against Quality, alleging, inter alia[1], that defendant discriminated against him on the basis of his disability in violation of the ADA. (Compl. at ¶ 6.)

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED.R.CIV. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. Rule 56 (c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

---

[1] Plaintiff's initial complaint contained allegations that defendant's actions violated the Rehabilitation Act of 1973, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act. On September 18, 1996, however, plaintiff amended his complaint and only maintained his allegations that defendant terminated him in violation of the Americans with Disabilities Act. Thus, the court need only address plaintiff's Americans with Disabilities Act claim.

4

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman.* 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in the nonmovant's favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

Congress enacted the Americans with Disabilities Act "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). In order to achieve this goal, the Act prohibits a covered employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to . . . [the] discharge of employees . . . ." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA plaintiff must show that: 1) he has a disability; 2) that he is a qualified individual; and 3) that he was discriminated against because of his disability. *Pritchard v. Southern Co. Servs.* 92 F.3d 1130, 1132 (11th Cir. 1996) (citing 42 U.S.C. § 12132.) In the present case, the predominant issue facing the court is

5

whether plaintiff has presented evidence sufficient to establish that he suffers from a disability, as that term is defined by the ADA. In the opinion of the court, plaintiff has not presented sufficient evidence with respect to this issue.

Under the ADA, disability is defined as: "A) a physical or mental impairment that *substantially limits* one or more of the *major life activities* of such individual; B) a record of such an impairment; or C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (emphasis added). Plaintiff maintains that the deterioration of his ankle and foot rendered him disabled because it substantially limited the major life activity of walking.

Although pertinent EEOC regulations define the phrase "major life activities" to include the function of walking, 29 C.F.R. § 1630.2(I), plaintiff must, nevertheless, establish that his ability to walk is substantially limited. While the ADA does not define the phrase "substantially limits," EEOC regulations provide that the term *substantially limits* means:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(i) & (ii). Because it is undisputed that plaintiff can perform the major life activity of walking, the question the court must address is whether sufficient evidence exists "from which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the

general population." *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3rd Cir. 1996). A review of the evidence reveals that plaintiff is not so restricted.

Plaintiff was employed at Quality from October 1, 1991 until July 6, 1995. During that time period, his supervisor and co-workers observed the degree to which his ankle and leg condition affected his ability to walk. At his deposition, plaintiff's supervisor, Billy McKay, testified that, on more than one occasion, he observed plaintiff limping while at work, but not limping on his way to the car. (McKay Dep. at 58-59). Furthermore, on some occasions, he did not notice plaintiff limping for the entire day. Even when plaintiff did walk with a limp, however, he appeared to get around okay, and he did not require a cane or crutches. (McKay Dep. at 58.) Similarly, one of plaintiff's co-workers, Neil Lumpkin, testified that plaintiff was able to walk okay, that he never saw him use a cane or crutches, and that weeks would go by that he would not notice plaintiff limping at all. (Lumpkin Dep. at 43-44.)

Additionally, the deposition testimony of Robert Flatt, President of Service Machine Company ("SMC"), is particularly probative on the issue of the degree to which plaintiff's condition restricted his ability to walk. After plaintiff's employment with Quality ended in July of 1995, plaintiff began working as a plant supervisor at SMC in September of that same year. (Lambeth Dep. at 18-19.) During the approximately seven month period in which plaintiff was employed at SMC, Robert Flattt testified that plaintiff typically worked from ten to thirteen hours per day, five and six days per week. (Lambeth Dep. at 18; Flatt Dep. at 21.) Flatt estimated that in a twelve hour work day, plaintiff was either standing or walking for eight to nine hours per day, and although there were times when he noticed plaintiff limping, he never observed plaintiff use a cane or crutches. (Flatt Dep. at 23.) Furthermore, plaintiff

7

never informed Mr. Flatt or Ruthie Davidson, the personnel manager at SMC, of his doctors recommendation that he be restricted to a forty hour work week, with no more than five days of work per week. (Flatt Dep. at 22; Davidson Dep. at 9-10.)

Even plaintiff's own physician, Dr. Gaylon Rogers, testified that although there were times when plaintiff walked with a limp, on other occasions, he would walk normally, with no noticeable limp at all. (Rogers Dep. at 38.) Moreover, and perhaps most importantly, in Dr. Roger's opinion, plaintiff should be able to walk eight hours per day in a forty hour work week, so long as he not work more than five days in a row and not be required to stand for more than two hours at a time, without having a break of approximately fifteen minutes to unload his ankle. (Rogers Dep. at 38-39; Pl.'s Ex. 3 attached to Rogers Dep.) Given that the relevant inquiry is whether plaintiff's ability to walk is restricted in comparison to the average person, and given that plaintiff's physician recommended that he work the same number of hours per week as the average person, plaintiff is unable credibly to claim that his condition significantly restricts his ability to walk in relation to the average person.

In a further attempt to establish that he is disabled, plaintiff argues that Dr. Gaylon Rogers testified that plaintiff's condition substantially limited him in the major life activity of walking. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 4.) The court disagrees with plaintiff's interpretation of Dr. Roger's deposition testimony. Specifically, according to plaintiff, Dr. Rogers was asked, "I take it Mr. Lambeth's end stage post traumatic joint disease substantially limited major life activities, such as walking; is that correct?" Dr. Rogers responded by stating: "I would think so, yes. Based on the radiographic changes and the narrowed joint space and the objective findings that you can see, again, on his x-ray, and the natural history of the process, I would think it would

8

significantly limit the young man as he was *when this happened*." (Rogers Dep. at 18) (emphasis added). In the court's view, Dr. Rogers was referring to plaintiff's condition as it existed at the time of the incident which caused the injury, and not as it existed at the time of Roger's deposition. Otherwise, Dr. Rogers would not have used the terms "the young man as he was when this happened." This interpretation of Dr. Roger's testimony is bolstered by the fact that when asked whether he thought plaintiff's condition rendered him disabled, Dr. Rogers stated that, in his opinion, plaintiff was not disabled. (Rogers Dep. at 39.) Moreover, even if plaintiff's interpretation of Dr. Roger's testimony is correct, the question posed to him was not phrased in a way that incorporated the statutory and regulatory terms that define what constitutes a disability under the ADA. Although the opinions of medical experts can be highly persuasive, and in some cases dispositive, with respect to the disability determination, such opinions can only be relevant when medical experts are questioned using the terms that Congress and administrative agencies have deemed pertinent to this inquiry.

Plaintiff also argues that he satisfies both the second and third prongs of the statutory definition of disability. The court disagrees. First, with respect to the second prong, an individual has a record of such impairment if he "[h]as a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. 1630.2(k). Although Dr. Rogers treated plaintiff for approximately thirteen years for his ankle condition, after reviewing the evidence, the court concludes that no reasonable jury could find that plaintiff's condition substantially limited a major life activity. Thus, plaintiff has failed to present sufficient evidence with respect to the second prong.

9

Moving on to the third prong of the ADA definition of disability, under pertinent EEOC regulations, an individual is regarded as having such an impairment if he:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. 1630.2(l). Plaintiff does not satisfy any of these tests. Both plaintiff's supervisor, Billy McKay, and Quality's General Manager, James Bailey, testified that they did not think Mr. Lambeth was disabled. McKay was so confident in plaintiff's abilities that he often assigned plaintiff the most desirable jobs because he believed that plaintiff was the best person suited for the job. (McKay Dep. at 14-15 & 53.) Additionally, one of plaintiff's co-workers, Neil Lumpkin, testified that plaintiff was a good machinist, was often assigned the better jobs, and that whatever problem he had with his ankle did not keep him from doing his job. (Lumpkin Dep. at 41 & 43.) Similarly, another one of plaintiff's co-workers, Jeff Ragsdale, testified that plaintiff was assigned the better jobs, in part, because he was a pretty good employee. (Ragsdale Dep. at 23-24 & 38.) Based on this evidence, the court concludes that plaintiff's supervisors and co-workers did not regard him as being impaired as defined by the ADA and pertinent regulations.

Finally, plaintiff cites the deposition testimony of Neil Lumpkin, and argues that a jury could draw a reasonable inference that plaintiff's supervisor, Billy McKay, regarded him as having

10

suffered an impairment, because McKay allegedly laughed at jokes about plaintiff's limp. (Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 8 (citing Lumpkin Dep. at 40.)) Specifically, in his deposition Lumpkin was asked the following questions and responded with the following answers:

> Q. Did y'all ever joke about Bill's limp?
>
> A. There was a few of them that did.
>
> Q. Billy [McKay] included?
>
> A. No, I didn't see Billy [McKay]. Billy [McKay] never did do that. He might laugh over something that somebody said or something.

(Lumpkin Dep. at 40.)

In an affidavit attached to defendant's reply brief, Lumpkin clarified his deposition testimony by stating:

> At page 40 of my deposition I was asked whether anyone at Quality ever joked about Lambeth's limp. My reply was that some of my co-workers did make jokes. The attorney for Mr. Lambeth did not ask further questions of me regarding this matter. I now understand that Mr. Lambeth's attorney interpreted my response to mean that co-workers were laughing at Mr. Lambeth's disability because his limp was so severe. This is not what I meant in my response. Workers made jokes about Mr. Lambeth only because he seemed to limp on occasions when he had a tough job to do and didn't want to do it. Lambeth did not always limp. He would begin limping most often when he was assigned a tough job and then he would lay out of work until the job was finished.
>
> Also at page 40 of my deposition, I was asked whether Billy McKay ever made jokes about Lambeth's limp. I replied that he did not. I then stated that he might laugh over something that somebody else said. However, I do not recall any occasion when Billy McKay ever laughed about Lambeth's limp and I have not

11

> personally observed Billy McKay laughing about any joke that any of my co-worker's made about Lambeth."

(Lumpkin Aff. at ¶ 4, attached as Ex. 2 to Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J.) Assuming, however, for the purposes of this Motion, that McKay did laugh at jokes about plaintiff's limp, this alone would not be enough to establish a disability under the ADA.

After reviewing all of the evidence submitted by both parties, and drawing all reasonable inferences in plaintiff's favor, the court is of the opinion that plaintiff does not suffer from a disability as that term is defined by the ADA. Although "[i]t is difficult, indeed perhaps not possible, to draw a bright line delineating the point at which a condition affecting an employee's ability to walk can be regarded as a disability within the ADA," *Kelly*, 94 F.3d at 108, the court is confident that plaintiff's condition places him nowhere near that line.[2]

## IV. CONCLUSION

Based upon the foregoing reasons, the court holds that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. An order denying plaintiff's Motion for Partial Summary Judgment and granting defendant's Motion for Summary Judgment will be entered contemporaneously herewith.

DONE this 31st day of January, 1997

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge

---

[2] Assuming *arguendo* that plaintiff had established a disability under the ADA, he has not presented sufficient evidence with respect to the third prima facie requirement, that he was discriminated against because of his disability. Consequently, defendant's motion for summary judgment is also due to be granted on this alternative basis.

12